TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 26162, 28661. Promulgated October 31, 1929.

*T. M. Pierce, Esq., Nelson Trotman, Esq., Fred Esch, Esq.,* and *S. M. Wallace, Esq.,* for the petitioner.

*J. A. Adams, Esq., Frank A. Surine, Esq.,* and *J. T. Haslam, Esq.,* for the respondent.

1138

1148

1152

1154

# 1160

OPINION.

PHILLIPS: The petitions raise numerous issues. The parties have filed a stipulation by which much of the evidence is introduced into the record. In this stipulation petitioner abandons several of the errors assigned and the respondent confesses error, in whole or in part, as to others. Proper adjustment may be made upon recomputation of the deficiency under Rule 50.

It is urged by petitioner that during the years here involved it was affiliated with the St. Louis Bridge Co. and the Tunnel Railroad of St. Louis. This issue was before the Board in *St. Louis Bridge Co.* v. *Commissioner*, and *Tunnel Railroad of St. Louis* v. *Commissioner*, 17 B. T. A. 185. By agreement of the parties the record made upon the hearing of those cases was incorporated by reference into the record in the hearing of the present proceedings. The findings of fact made in that report are incorporated by reference in our findings of fact above. Upon authority of that decision the claim of affiliation is denied.

We come next to consider the questions which arise out of the settlement made with the Director General of Railroads for the period of Federal control. Pursuant to law, the President of the United States, acting through the Director General of Railroads, took possession and assumed control of the railroads and transportation systems of the petitioner and its affiliated companies on December 28, 1917. On May 19, 1919, contracts were entered into which provided for the compensation to be paid these railroads and which contained other provisions to which we will have occasion to refer hereafter. On March 1, 1920, the railroad properties were surrendered and turned back to their owners. Thereafter negotiations were entered upon to settle the accounts between petitioner and its affiliated companies and the Director General of Railroads. Each claimed that upon such settlement the other was indebted. The nature of several items of the claims was such that there could be no exact measurement. The negotiations terminated in an understanding that each should waive any claim upon the other. The Director General was to prepare formal agreements. When these were forwarded to petitioner and its affiliated companies, it was found that they provided for payments of $60,000 to petititoner and $145,000 to the Wiggins Ferry Co. and other corporations affiliated with the petitioner and the payment by St. Louis Merchants Bridge Terminal Railway Co. to the Director General of $205,000. The petitioner, through its president and its counsel, objected to this form of settlement. They were informed by the Director General that this was a matter of bookkeeping done for the purpose of clearing the books. The two checks from the Director General which accompanied the proposed settlement agreements were endorsed by the payees to the order of the St. Louis Merchants Bridge and Terminal Railway Co. and by that company to the Director General of Railroads. The. final settlement agreements were executed by the companies and the Director General and the matter closed.

The settlement which was reached between these parties involved the consideration of the several claims going to make up the total. Some of these claims affected the computation of the income of the railroad and others affected only capital accounts. For. example, the railroads admittedly owed substantial sums because of additions made to their property during Federal control, for which they were liable but had not paid. On the other hand, the railroads claimed that large amounts had been expended for additions which were of no benefit to them and which should be paid for by the Director General under section 8 of the contracts. Neither of such claims affected the computation of income for the year. There were other claims which affected income but concerning which there is

no dispute between the parties to the present proceeding. Other items of the claims which were in dispute in the negotiations affect the computation of the income of petitioner and its affiliated companies, and it is with these items that we are now primarily concerned. These include the items referred to as undermaintenance, materials and supplies, interest on completed additions and betterments, and additional rentals.

The contracts between the Director General and the companies provided in paragraph 5 thereof that the Director General should expend such amounts as were requisite in order that the properties might be returned to the companies in substantially as good repair and substantially as complete equipment as when taken over. If excessive expenditures were made, such excess was to be made good by the companies. If, on the other hand, the properties were not kept in as good repair and as complete equipment as when taken over, the railroads would have a claim for undermaintenance.

The petitioner claimed that its properties were undermaintained to the extent of $150,000. Its subsidiaries made no such claim. The Commissioner determined that in the final settlement the petitioner and one of its subsidiaries were allowed $212,142.77 as undermaintenance. During 1920 these companies expended amounts greatly in excess of $212,142.77 for maintenance of their properties. In determining the amount which these companies were entitled to deduct as expenses of maintenance the Commissioner reduced the amount expended by the amount which he claimed was paid for undermaintenance by the Director General.

The petitioner's first position is that the amounts expended for maintenance should not be decreased by any payment or allowance made by the Director General for undermaintenance; if this be declared indefensible, his secondary defense is that no such allowance was made.

It may be conceded that whatever payment or allowance was made to the petitioner for undermaintenance does not constitute income to it; it represents no more than a return to it of its original capital investment. There may be exceptions where such a payment might represent the conversion of an asset into a greater amount of cash than such asset cost, and, consequently, a resulting taxable gain, but there is nothing in the record that would indicate such a situation in this case, nor does either party so contend. Both are satisfied to take the position that the payment or allowance did not represent gain or taxable income. The position of the Commissioner may be simply stated. When the properties were returned on March 1, 1920, they were undermaintained; during the balance of that year over $1,000,000 was expended for maintenance; a part of this represented

expenditures made to overcome the undermaintenance of the period of Federal control and to restore the properties to their normal condition and a part represented normal maintenance; to the extent that expenditures were made to overcome the undermaintenance of the period of Federal control and were paid for by the Director General of Railroads, they do not represent an ordinary and necessary expense of its business, incurred and paid by petitioner, which is deductible in computing its net income subject to tax, but rather an expense paid by the Director General. In other words, the payment claimed may have been made in the first instance by the petitioner but petitioner was later reimbursed for such expense, so that in effect the expenses for maintenance, to the extent of such reimbursement, were not expenses incurred by it. Upon this basis the Commissioner has reduced the amount expended by petitioner during the year 1920 for maintenance by the amount which he asserts was later paid petitioner to recompense it for a part of such expenditure.

We are of the opinion that the Commissioner must prevail in his contention. The statute (sec. 214, Revenue Act of 1918) provides that in computing net income of a taxpayer there shall be allowed as deductions all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. We do not understand that this would permit the deduction of expenses paid or incurred by the taxpayer for which he is reimbursed. In such a case the expenses are not his, nor are they paid or incurred by him within the meaning of the statute. The taxpayer is allowed the expenses of its business borne by it and is taxed only upon its net income after its expenses have been deducted.

There is no difference in substance between a situation where the property had been properly maintained by the lessee and one where, having been undermaintained by the lessee, such undermaintenance is overcome by the lessor at the expense of the lessee. If the Director General of Railroads had expended the amount here in question and had thereby been enabled to return the properties to the petitioner free of any undermaintenance, there would be no claim that petitioner might deduct the amount so expended. Instead, the property is returned to the lessor in a condition of undermaintenance, brought into condition by such lessor and the cost thereof paid by the lessee.

It might be pointed out that a payment made to indemnify the owner for undermaintenance of property may well stand upon a different footing from a payment made for failure to return the property or a specific part of the property taken. See *Lehigh & Hudson River Railway Co.*, 13 B. T. A. 1154, where it was held income resulted where materials and supplies taken over by the Director General and not returned were paid for at an amount in excess of

cost. In the latter case there is a receipt of cash for property which amounts to a sale or other disposition of such property, which we do not understand to be the case where, as here, the property taken was returned but in poorer condition than when taken; where, for example, hardwood ties in the roadbed had been replaced by ties with a shorter life, or the lessee had failed to replace ties which had passed their useful life. These are incidents of maintenance of the roadbed, not a sale of a part of the roadbed. Where, as here, the lessor proceeds upon the return of its property to restore it to its previous condition, it is our opinion that amounts received from the lessee as indemnity for failure to keep the property in condition may properly be offset against the amount expended in determining the amount of such expenditures which are deductible in computing net income subject to taxation.

The petitioner takes the position that undermaintenance was not made good in 1920 and that any payment or credit made or allowed in the final settlement for that purpose should be allocated over other years. The only evidence we have on this point are schedules showing amounts expended in the various years. There is nothing to indicate how prices of labor and materials varied in these different years, or other information which would permit dollars to be stated in terms of physical maintenance. Such tabulations of expenditures are insufficient to overcome the presumption that the determination made by the Commissioner is correct or to permit an allocation of the expenditures made to overcome undermaintenance.

Petitioner's alternative contention is that the Commissioner erred in his determination that the amount paid or allowed for undermaintenance in the final settlement between petitioner and its subsidiaries and the Director General was $212,142.77. Involved in this is the competency, materiality and relevancy of the entries made upon the books of the Director General purporting to show an itemization of the final settlement by the allocation of amounts to each of the items making up the claims of petitioner and its affiliated companies. The parties have stipulated the entries made on those accounts, but the petitioner in such stipulation reserved his objections thereto which he renewed at the hearing. We need not repeat here the details of the negotiations which took place which will be found stated in the findings, and which led to a lump-sum settlement of the claims. The evidence shows that after an agreement had been reached between petitioner and its subsidiaries and the Director General for the settlement of their claims by each party withdrawing its demands on the other, officers of the petitioner requested information of the allocation made on the books of the Director General. Such information was refused. At no time until after this contro-

versy arose was such information available to petitioner. The respondent now seeks to use such entries as evidence to establish the proper allocation of the settlement.

The entries in question were made after the settlement had been agreed upon. Except as to the amounts paid, concerning which there is no dispute, such entries do not record or evidence any fact or any transaction. They represent no more than the opinion of some unknown person of the proper allocation of a lump-sum settlement. There is nothing to indicate what influences caused the allocation of particular amounts to particular items of the claim. Indeed, it is difficult to conceive of the necessity for such an allocation of what was admittedly a lump-sum settlement. While books and records which record facts and transactions had by Government officers may be competent to prove such facts and transactions, as respondent contends, the entries here in question could not come under any such rule. The objections of the petitioner to the admission of such entries as evidence is sustained. See *Gurley* v. *McLemon*, 17 App. D. C. 170.

It is the contention of the petitioner that in the allocation of the settlement, insufficient amounts have been attributed by the Commissioner to such capital items as the cost of replacing the 14th Street viaduct, and the claim under section 8 of the contract arising out of the construction of Wiggins Yard and that excessive amounts have been attributed to items of undermaintenance and materials and supplies. The evidence submitted to us indicates that the claim of the petitioner for undermaintenance of its properties rested upon a much better basis than its claims with respect to such capital items. While these latter claims were not without merit, we believe that the evidence fails to establish that any error was committed in preferring the claim for undermaintenance over such other claims. It might be pointed out at this point that as the result of our decision set out below with respect to the proper amount of the settlement to be allocated to undermaintenance and materials and supplies, approximately $223,000 is made available for allocation to such capital items.

In his allocation of the items of the settlement the Commissioner has gone further than preferring the claim for undermaintenance over the capital items in dispute. The amount claimed by petitioner for undermaintenance was $150,000 and no such claim was made by its subsidiaries. Despite the facts that the Director General had taken and maintained throughout the negotiation the position that the properties were heavily overmaintained and had settled with the petitioner for an amount substantially less than that claimed by the petitioner, the Commissioner determined that the Director General allowed for this item $62,142.77 more than the amount claimed. In our opinion this action finds no support in the record. In view of

the positions taken by the parties to the settlement and the final result reached, we are of the opinion that there can not be attributed to undermaintenance any greater amount than the amount claimed by the petitioner. The amount allowed as a deduction for maintenance in computing income for 1920 should be increased accordingly.

We come next to consider the issue arising under section 9 (b) of the agreement which reads:

At the end of Federal control the Director General shall return to the Companies all uncollected accounts received by him from them and also materials and supplies equal in quantity, quality and relative usefulness to that of the materials and supplies which he received, and to the extent that the Director General does not return such materials and supplies he shall account for the same at prices prevailing at the end of Federal control. To the extent that the Companies receive materials and supplies in excess of those delivered by them to the Director General they shall account for the same at the Prices prevailing at the end of Federal control and the balance shall be adjusted in cash.

The Director General received from petitioner materials and supplies which had cost $876,511.65 and from the Wiggins Ferry Co. he received materials and supplies which had cost $47,397.05, a total of $923,908.70. At the end of the period of Federal control there were returned to the petitioner materials and supplies inventoried at $1,854,637.05. Such materials and supplies were set up on the books of the petitioner at that amount. During 1920 the petitioner consumed some or all of such materials and supplies and charged the value thereof to operating expenses. It deducted on its return of net income for 1920, $1,817,506.73 for materials and supplies used or consumed in that year. The Commissioner determined that although materials and supplies having an inventory value of $1,817,506.73 had been expended during the year, that figure did not represent the cost of such materials and supplies to the petitioner. He recomputed such cost on a basis which we understand to be as follows: The materials and supplies turned over to the Director General cost petitioner $876,511.65; at the end of Federal control there were returned to petitioner "materials and supplies equal in quantity, quality, and relative usefulness" to those surrendered and an excess of materials and supplies, which were paid for by petitioner in the amount, as contended by Commissioner, of $389,787.19, all of which materials and supplies were inventoried by petitioner and entered upon its books in the amount of $1,854,637.05; the Commissioner therefore claims that the materials and supplies which were put upon the accounts of petitioner at $1,854,637.05 cost the petitioner only $1,266,298.84; since the deduction claimed by petitioner for materials and supplies consumed during the year was based upon inventory value as entered upon its books, and since such inventory value exceeded the cost by $588,338.21 and since the

Commissioner was of the opinion that only the cost of such materials and supplies could be deducted, he reduced the amount allowed as a deduction by $588,338.21. It is conceded by the respondent that by reason of certain error in the computation, the amount disallowed should have been $503,810.84. This concession does not, however, affect the principle involved, for upon the authority of our decision in *Indiana Harbor Belt Railroad Co.*, 16 B. T. A. 279, the petitioner contends that " the excess in money value of such materials and supplies is not subject to taxation." The sole question involved in that proceeding, so far as materials and supplies were concerned, was, as there stated, " whether the difference between the value of materials and supplies turned over to the Director General of Railroads on December 31, 1917, and the value of such materials and supplies turned back by him on February 20, 1920, is income to petitioner in 1920." There the Commissioner sought to tax such difference in value as a part of the gross income of the petitioner. Here there is no such attempt. Here the Commissioner contends that in determining the deduction to which petitioner is entitled for expenditures of materials and supplies, cost must be considered instead of the increased value at which such materials are turned back. While the result in the present case is substantially the same as it would have been had the Commissioner included such increased value as income, this is only so because it has been assumed (and the record does not establish that such assumption is incorrect) that all materials and supplies received in 1920 to replace those turned over in 1917 were expended in 1920. If we could assume that no part of the materials or supplies so received was used in 1920, or that only a fixed percentage was used in that year, the computation of the cost of the materials and supplies consumed during the year would have to be adjusted accordingly. The distinctions between the two positions taken in these two cases are not merely distinctions in theory, but are such as to lead to very different results in many cases. If the increase in value is income as the Commissioner contended in *Indiana Harbor Belt Railroad Co.*, *supra*, it affects the taxes of only one year. But if it affects the deductions allowable, this increase in value affects the years in which the materials and supplies are consumed and is to be spread over such years in proportion to such consumption. We are of the opinion that the question now presented is entirely different from that presented in the case cited and is not controlled by the decision there reached. We are further of the opinion that the principle adopted by the Commissioner in allowing as a deduction only the cost to petitioner of materials and supplies used is sound. Cf. *United States* v. *Flannery*, 268 U. S. 98,

and *United States* v. *Ludey,* 274 U. S. 295, where deductions were confined to actual losses.

With reference to this item the petitioner further contends that the Commissioner has erroneously computed the cost of its materials and supplies. Its contention is that upon the settlement with the Director General it paid $550,476.29 for materials and supplies while the Commissioner fixed the amount paid at $389,787.19. In the claim filed by petitioner with the Director General it admitted that it owed the Director General $550,476.29 for excess materials and supplies. The basis of the settlement lends no support to the theory that petitioner paid or was charged less for these materials and supplies than it admitted was due from it to the Director General. We are of opinion that the cost thereof should be increased accordingly.

During the years 1918, 1919, and 1920 there accrued to petitioner and its subsidiaries, under section 7 of the agreements with the Director General, interest on amounts expended for additions and betterments in the amount of $109,082.04. Upon the final settlement this was one of the items paid or credited to petitioner and concerning which there was no disagreement. It represents no more than a mathematical computation of interest on amounts expended for capital additions. The Commissioner treated the whole of such amount as income for 1922. At the time this proceeding was heard, the Board had promulgated its decision in *Texas & Pacific Railway Co.,* 9 B. T. A. 365, and *Chicago, Rock Island & Pacific Railway Co.,* 13 B. T. A. 988, wherein the Board held that such interest was income in the years in which it accrued. In recognition of these decisions, it was stipulated that should the Board find that the interest should be accrued, it should also find that the income for 1920, as determined by the Commissioner should be increased by $19,140.61. The income for 1920 should be so increased and the income for 1922, as determined by the Commissioner should be reduced by $109,-082.04 on account of this item.

There is a somewhat similar situation with respect to rentals. The fixed compensation to be paid petitioner for its properties was based upon operating revenues over a test period, July 1, 1914, to June 30, 1917. There were provisions for adjustments in certain cases. During the period of Federal control petitioner was the lessee of certain property for which it paid greater rent than was paid during the test period. This excess rental it was entitled to receive back from the Director General. The petitioner paid such excess rental and deducted such payments on its returns for 1918, 1919, and 1920. Such deductions were allowed by the Commissioner. Under the accrual system of accounting petitioner should also have accrued an equal amount as income in those years, being a part of the

rent to be paid it. *Texas & Pacific Railway Co., supra.* The income of the petitioner and its affiliated companies for 1922, as determined by the Commissioner, should be reduced by the amount included therein on account of such rentals, $86,530.23, and the income for 1920 increased by the amount which accrued in those years, $8,625.38.

During each of the taxable years involved petitioner claimed $3,388.88 as a deduction for the amortization of the discount at which it had sold its bonds in 1907. The Commissioner allowed the deduction in 1920 but now alleges that he committed error in doing so. He refused to allow the deduction in 1922, and this petitioner alleges was error. This same question was before us in *Chicago, Rock Island & Pacific Railway Co.*, 13 B. T. A. 988, where we held that such a deduction is allowable where books are kept upon an accrual basis. The deductions claimed should be allowed this petitioner.

The act of the Commissioner in refusing to allow as deductions amounts paid as fines for violation of Federal statutes is approved upon authority of *Great Northern Railway Co.*, 8 B. T. A. 225. and *Chicago, Rock Island & Pacific Railway Co.*, 13 B. T. A. 988.

Petitioner claims the right to deduct payments made to the East St. Louis Branch of the railroad Y. M. C. A. The Commissioner disallowed the deduction on the ground that charitable and like contributions are not allowed as deductions to corporations. The Board has repeatedly held that charitable contributions may not be deducted as such by a corporation. But there are certain circumstances where such payments may be more properly classified as ordinary and necessary expenses of the business. Where it is established that a direct benefit and convenience results to the business, the Board has held that deduction may be allowed as a business expense. *Indiana Harbor Belt Railroad Co.*, 16 B. T. A 279, and cases there cited. Such is the case here and the deduction should be allowed.

Petitioner claims that it sustained a loss in 1922 upon the retirement of a part of the capital stock of the Interstate Car Transfer Co. It appears that in 1903 the petitioner acquired all of the capital stock of that company, consisting of 5,000 shares of the par value of $100 per share, at a cost to it of $675,000. In 1922 the capital stock of the transfer company was reduced to $5,000 par value, and $495,000 par value of the stock held by petitioner was retired. In connection with the retirement of this stock the Transfer Co. gave to the petitioner $366.67 in cash, assigned to it an account due the Transfer Co. from the Wiggins Ferry Co., a subsidiary of the petitioner, amounting to $15,000, and canceled an account due to the Transfer Co. from the petitioner in the amount of $293,705, from which we conclude that upon the retirement of this stock $309,071.67 was paid over to the petitioner.

While the cost of the stock and the amount realized on its redemption were thus satisfactorily established, this is insufficient to establish any deductible loss in the absence of proof of the March 1, 1913, value of this stock. *Goodrich* v. *Edwards*, 255 U. S. 527; *United States* v. *Flannery*, 268 U. S. 98; *McCaughn* v. *Ludington*, 268 U. S. 106. In the stipulation filed by the parties there appears " a comparative balance sheet drawn from the books of account of the Interstate Car Transfer Company as at June 30, 1902, March 1, 1913, and December 31, 1921," " analysis of certain balance sheet accounts as at the date shown above " (which analysis indicates that a substantial part of the so-called assets carried on the balance sheet at March 1, 1913, were either not assets or were those whose life had expired prior to March 1, 1913, or was about to expire), and a schedule which purports to show the operating gain or loss and certain other information " as disclosed by the books and records of the Interstate Car Transfer Company during the years 1902 to 1921, inclusive." This schedule purports to show gain from the operation of the Interstate Car Transfer Co. from 1902 to 1908, inclusive, and a loss from 1909 to 1914, inclusive. If such schedule is considered in connection with the other schedules in the record it indicates that the Interstate Car Transfer Co. realized little, if any, profit from its operations at any time. There also appears in the stipulation the following statement:

In stipulating the facts relative to the history of the Interstate Car Transfer Company and as to the information contained in the books and records of the Interstate Car Transfer Company, the petitioner does not concede the competency, materiality or relevancy of said history and information, but on the contrary petitioner asserts that said history and information is incompetent, immaterial and irrelevant in this proceeding.

At the time of the hearing both parties agreed that a ruling upon the objections appearing in the stipulation should properly be reserved until the Board came to consider the case upon its merits and the parties had an opportunity to file their briefs. The objection which we now have under consideration was only one of several appearing in the stipulation. Facts relative to the history of the company and as to its profits and losses in the years prior to March 1, 1913, and as to its assets on that date are undoubtedly material and relevant in this proceeding for the purpose of proving the value of the stock of the company on March 1, 1913. A bare statement that books of account show certain asset values or certain profits and losses, standing by itself without any evidence that the books were kept in the ordinary course of business or accurately reflected the assets, liabilities, profits and losses of the business can scarcely be deemed competent to prove the value of the assets or the amount of the liabilities or the gains or losses of the business. This is especially

so in a case such as we have here, where other entries quoted from the books establish that such books were not kept in a manner which would accurately reflect such items. We are accordingly of the opinion that the objection to the competency of such book entries must be sustained, except where the stipulation is to the effect that the facts are as shown in such entries. The effect of the ruling is to leave the record without any proof of March 1, 1913, value. It may be pertinent to state, however, that if we could assume that the facts were accurately stated in the book entries, our conclusion would be that the stock of this company had no greater value on March 1, 1913, than was realized on its redemption.

The respondent raises two other serious questions which stand between the petitioner and the allowance of the loss claimed. It is contended that the Interstate Car Transfer Co. was a subsidiary of the petitioner, was affiliated with it, and is one of the taxpayers making a consolidated return of income with the petitioner. It is urged that in such a situation the affiliated group can not take a loss resulting from the liquidation of the stock of one of its members. *American LaDentelle, Inc.*, 1 B. T. A. 575; *Cooperative Furniture Co.*, 2 B. T. A. 185; *Frank G. Shattuck Co.*, 2 B. T. A. 7; *H. S. Crocker Co.*, 5 B. T. A. 537; *Meurer Steel Barrel Co.*, 11 B. T. A. 585. As a second defense it is urged that this company continued in existence after 1922 and continued to render returns and pay an annual state franchise tax, indicating that there must have been something of value left in the company, although its books of account disclose no assets. The petitioner continued to own exactly what it had owned before the retirement of a part of the capital stock, namely, all of the capital stock of the company. In such circumstances there may be doubt whether the retirement of a part of the capital stock gives rise to a deductible loss or serves only to reduce the cost of the remaining stock. See *Eisner* v. *Macomber*, 252 U. S. 189, and *Miles* v. *Safe Deposit Co.*, 259 U. S. 247. We find it unnecessary to pass upon either of these questions.

The petitioner claims the right to deduct as a debt ascertained to be worthless and charged off in 1922 amounts which became due to it from A. Leschen & Sons Co. between 1908 and 1911. When these bills were presented to the Leschen Co., their attorney set up a demand for alleged overcharges for switching operations. The petitioner did not wish to try out this issue and its conclusion with respect to this matter is set out in the memorandum from its president to its auditor, which was submitted in evidence and which reads in part:

I think we had better hold our bills against Leschen Company in suspense. so that we can use them in the claims of this firm if they determine to press

them. If we press the collection of our bills they will undoubtedly enter suit for alleged overcharges in switching, which would invite suit from a great many other industries. You are authorized to hold these bills in suspense.

In a letter under date of February 29, 1916, from the president to the auditor, with respect to this account, the president stated the facts set out above, referred to his letter of June 13, 1912, quoted above, and said:

The situation has not changed since then. If we should undertake to enforce settlement through our legal department there is no question that the Leschen Company would again bring up their claim for overcharges, and if the matter should get into the court it might induce others to file similar claims. As a matter of policy I think this account should be held in suspense, and if at any time Leschen & Sons should present their claim for overcharges we can use this to offset it. If you want to get it out of your accounts you might charge it off to profit and loss and hold it in suspense in that way. It is not probable that we will be able to collect the amount without a lawsuit, which, as stated above, is something we do not want.

The situation continued the same until 1921 when the issue raised in the counterclaim of the Leschen Co. was settled by the Supreme Court, whereupon the petitioner again sought to collect from the Leschen Co. That company in 1922 paid so much of the claim for rent as was not outlawed by the statute of limitations, but continued to refuse to pay for building the switch and for those rentals which were barred from collection by the statute.

Although the greater part of the indebtedness was incurred in 1908 and the statute of limitations ran upon collection in 1918, it is urged by petitioner that the indebtedness was first ascertained to be worthless in 1922. It is quite true, as petitioner points out, that the Board has determined that the running of the statute of limitations does not establish worthlessness of an indebtedness, since the statute to be effective must be pleaded by the debtor, and it is not to be assumed that debtors will plead such a statute in all circumstances. Here, however, we have a different situation. The testimony is that the debtor had repeatedly refused to pay the debt and that petitioner had determined not to bring suit but to hold the matter in suspense and that this was the situation at the time the statute of limitations ran. We are of the opinion that such indebtedness was ascertained to be worthless and should have been charged off prior to 1922. The fact that it was not charged off until the later year does not permit of its deduction then. *Avery* v. *Commissioner*, 22 Fed. (2d) 6.

In his answer the respondent alleges that he erroneously computed the taxable income of petitioner for the two years involved by allowing deductions for depreciation upon the Eads Bridge and its approaches and upon tunnels and subways operated by petitioner as lessee. Respondent asks that the net income be increased accordingly. The principles applied by the Supreme Court in *Weiss* v. *Wiener*,

279 U. S. 333, would appear to govern this case. See, also, *William J. Ostheimer*, 1 B. T. A. 18; *Belt Railway of Chicago*, 9 B. T. A. 304; *Ohio Clover Leaf Dairy Co.*, 13 B. T. A. 1320. The taxable net income should be increased by the amounts allowed as deductions for depreciation of these assets.

Reviewed by the Board.

*Decision will be entered under Rule 50.*